In re MUNICIPAL OFFICERS OF NEWPORT
*vs.*
MAINE CENTRAL RAILROAD COMPANY.

Penobscot.     Opinion January 18, 1924.

*A ruling by the Public Utilities Commission to constitute exceptional error must be
shown to have been prejudicial to the interest of the excepting party.    Where it is
claimed that a later of two statutes in pari materia repeals the former by
implication, the later statute must be so broad in its scope and so clear
and explicit in its terms as to show it was intended to cover the
whole subject matter and to displace the prior statute, or
the two must be so clearly repugnant that they cannot
stand together.*

In the instant case while the Commission may not make the protection of the
foolhardy alone the basis of its action, yet inasmuch as it does not expressly
appear that the alleged ruling was made the basis of its decision, unless by
inference it was necessarily involved therein, it would not appear from the bill
of exceptions that the railroad company was prejudiced by this statement.

There was sufficient evidence in the case on which its finding that additional
protection was required at the crossing in question may rest, without invoking
the broad doctrine excepted to by the railroad company as to the duty of the
Public Utilities Commission in such cases.

The Legislation of 1917 found in Chapters 50 and 145 is not repugnant to the
provisions of Sec. 73 of Chap. 56, R. S.   Nor were they clearly enacted to cover
the entire subject of protection of grade crossings, and so displace Sec. 73 of
Chap. 56.

On exceptions by defendant.   A proceeding by petition of the
Municipal Officers of the town of Newport to the Public Utilities
Commission under the provisions of Sec. 73 of Chap. 56 of the R. S.,
for the purpose of requiring the Maine Central Railroad Company to
maintain better protection to the traveling public at its grade crossing
near East Newport, known as Caverly Crossing.   A hearing was had
before the Commission and it ordered the railroad company to
install, maintain and operate continuously an automatic signal of
the audible and visible type at said grade crossing.

Counsel for the railroad company entered several exceptions to the rulings of the Commission and the case was certified by the clerk of the Commission to the Chief Justice under Sec. 55, Chap. 55 of the R. S. Exceptions overruled.

The case is fully stated in the opinion.

*William H. Mitchell*, for the town of Newport.

*Charles H. Blatchford and George E. Fogg*, for Maine Central Railroad Company.

SITTING: CORNISH, C. J., HANSON, PHILBROOK, DUNN, WILSON, DEASY, JJ.

WILSON, J. On April 2d, 1921, the Municipal Officers of the town of Newport, in accordance with the provisions of Sec. 73, Chap. 56, R. S., requested in writing the Maine Central Railroad Co., to erect and maintain gates across a certain highway in said town at a point locally known as Caverly Crossing, where the tracks of the Railroad Company cross the highway at grade, which request the Railroad Company refused. Whereupon the Municipal Officers appealed to the Public Utilities Commission.

The Commission after due notice and hearing found that public safety required an automatic signal to be maintained at this crossing and ordered the Railroad Company to install one of the visible and audible type.

To certain rulings and the finding of the Commission the Railroad Company filed exceptions, which were duly allowed and certified to the Chief Justice of this court under the provisions of Sec. 55 of Chap. 55, R. S.

The validity of the first, second, third and sixth exceptions, without setting them forth in terms, depends upon the authority of the Municipal Officers to proceed under Sec. 73 of Chap. 56, R. S., in case of a "fair view crossing" as defined in Sec. 2 of Chap. 145, Public Laws 1917, and may be disposed of as one exception.

The fourth and fifth exceptions relate to an alleged ruling by the Commission that it was its duty to provide protection at grade crossings, "even to the extent of protecting, so far as may be, the careless and foolish man from the effects of his own folly"; the contention of the Railroad Company being in substance that the finding of the Commission upon the evidence in this case, that the public

safety required the installation and maintenance of automatic signals at this crossing must have been based upon an improper conception of its duty in such cases, and was, therefore, unwarranted in law and hence confiscatory.

While the Commission in its findings did use the above quoted language, the bill of exceptions does not, we think, disclose that its final conclusion was based upon any such broad conception of its duty.

It may well be that if the laws enacted to prevent accidents at grade crossings were enforced, and travelers on the highways at all times used due care, there would be no need of gates or flagmen, or even automatic signals at what are termed "fair view crossings."

The Public Utilities Commission, however, in determining what public safety requires in the way of protection at grade crossings, while it may not make the protection of the foolhardy alone the basis of its action, may properly take into consideration the frailties of human nature, as well as the volume of travel, and the existing physical conditions surrounding the crossing, and may consider also the consequences which may flow from the negligent conduct of the imprudent, a certain degree of which, experience teaches, is quite as likely to enter into every "crossing accident" as the physical or inanimate conditions surrounding the crossing. Again, public safety at railroad crossings involves more than that of the drivers of motor cars. It includes as well, not only passengers therein and other travelers upon the highway, including those of tender years and immature judgment, but also those traveling by rail as well.

The alleged ruling of the Commission as to the scope of its duty was not expressly made the basis of its findings. Unless, then, by inference it was necessarily involved therein, it would not appear from the bill of exceptions that the Railroad Company was in any way prejudiced by the alleged ruling.

We think there was sufficient evidence in the case on which its finding, that additional protection was required at this crossing, may rest without invoking the broad doctrine, excepted to by the Railroad Company, as to its duty in such cases. The exceptions on this branch of the case must, therefore, be overruled. *Kilpatrick* v. *Hall*, 67 Maine, 543; *Look* v. *Norton*, 94 Maine, 547.

In support of its other exceptions, counsel for the Railroad Company strenuously urge that the Municipal Officers of towns may no

longer initiate proceedings under Sec. 73, Chap. 56, R. S., at least in the case of "fair view crossings," as defined in Sec. 2 of Chap. 145, Public Laws, 1917, within which definition, it is admitted, that the crossing here in question comes.

For a long time prior to 1917, the only method of compelling railroad companies to furnish protection at grade crossings was under Sec. 73 of Chap. 56, R. S. In 1917, in view of the increased use of the improved highways of the State by motor cars, and the alarming increase in so called "crossing accidents" in which automobiles were involved, the Legislature enacted Chapter 50, and the emergency legislation found in Chapter 145 of the Public Laws of that year.

Chapter 50 required the erection of warning signs along the highways at suitable distances on each side of grade crossings, except under certain conditions enumerated in the Statute, and regulated the speed of motor cars, after passing such warning signs, on approaching a crossing.

Chapter 145, entitled, "An Act to require Automatic Signals and the Removal of Obstructions at Certain Grade Crossings not Protected by Gates or Flagmen," after authorizing the Public Utilities Commission to require after due notice and hearing automatic signals to be installed at any crossing, then defined (Section 2) what are termed "fair view crossings," viz.: Crossings where travelers on the highway on either side of the crossing for the distance of one hundred and fifty feet can have a fair and continuous view of the railroad track each way for a distance of three hundred feet. By the provisions of Section 9 of this Act, the Public Utilities Commission were directed to proceed at once and within sixty days to make in effect a survey of all the grade crossings within the State, not protected by gates or flagmen, and designate such crossings as in their opinion required automatic signals or some other form of protection; and give to the railroad companies an opportunity to show cause at a public hearing why such protection should not be given.

To relieve the railroad companies of too great a burden resulting from such a summary proceeding, it was further provided that the installation of such protection might be extended over a period of · four years, or even a longer period, and should not apply to a crossing conforming to, or caused by the railroad company to conform to, the

requirements of a "fair view crossing" as defined in Section 2 of the Act, at least so long as a "fair view" was maintained.

Though relating to the same subject matter, the Acts of 1917 do not in express terms repeal or modify the provisions of Sec. 73, Chap. 56, R. S. It is not quite clear on what grounds the Railroad Company in the case at bar bases its contention that the municipal officers of towns no longer have any authority to initiate proceedings for protection at any crossing within the limits of their respective towns.

As we understand the contention of counsel, it is not claimed that the Acts of 1917 are repugnant to or in conflict with Sec. 73 of Chap. 56, or by implication repeal it; but that by the later Acts the Legislature intended to cover the whole subject matter of protection at grade crossings and, therefore, they supersede Section 73 and control, at least, so far as "fair view crossings" are concerned. We think this contention cannot be sustained.

There can be no difference in effect between a statute which by implication supersedes or controls and one which repeals. When statutes relating to the same subject matter are under construction and it is claimed that the one later in point of enactment repeals the former by implication, either because it was intended to supersede it, or because it is so repugnant to it that they cannot stand together, "the later statute must be so broad in its scope and so clear and explicit in its terms as to show that it was intended to cover the whole subject matter and to displace the prior statute, or the two must be so clearly repugnant and inconsistent that they cannot stand together." Courts will, if possible, give effect to both statutes and will not presume that the Legislature intended a repeal. *Eden v. Southwest Harbor*, 108 Maine, 489; Black's Interpretation of Laws, Sec. 53; Endlich on Interpretation, Sec. 210.

As counsel admit, there is no conflict between the prior law and the Acts of 1917. We think it equally clear that the later Acts were not enacted with the view of covering the entire field of safeguarding grade crossings and so supersede all prior legislation on this subject. They were enacted to meet an emergency and secure as speedily as possible protection in some form at all crossings not then adequately protected. Obviously neither prompt nor uniform action could be expected under the provisions of Sec. 73 of Chap. 56 under which the existing conditions had arisen.

The title of Chapter 145, indicating that it was not intended to apply to crossings already adequately protected by gates or flagmen; the fact that no provision appears to have been made for further proceedings in case of changed conditions, and the protection secured under the provisions of Section 9 proved inadequate; and that it was enacted as emergency legislation; all go to show it was not intended to create a complete and exclusive system of providing protection at grade crossings.

Section 9 did not even provide for a public hearing at which those locally interested might be heard as to the need and the kind of protection required at any particular grade. crossing.   The Commission was to arrive at its conclusions without even an *ex parte* hearing, and was then directed to notify the railroad companies of its conclusions and order a public hearing at which the railroad companies might then show cause why the protection determined upon should not be given.   Such at least are its terms as bearing upon the legislative intent.

There is apparent reason why "fair view crossings" should not have been made subject to such summary proceedings as are provided for in Section 9 of this Act; but if the Legislature had intended that such crossings should no longer be subject to the provisions of Sec. 73 of Chap. 56, whenever changed conditions made further protection necessary, we think it would have so provided and not left it to inference.

It is no answer to say that the Commission may upon proceedings under Section 73, at once abrogate the legislative fiat contained in ·Chapter 145 as to crossings at which a "fair view" can be had. The purpose of the exception of such crossings from the provisions of Section 9, which exception is based on an arbitrary assumption that a "fair view" will under ordinary conditions be sufficient protection, was, we think, rather to lighten the burden imposed upon .the railroad companies by this Act, where it could presumably be done with a reasonable degree of security to the traveling public, and is not to be considered the final word as to the sufficiency of such protection under all circumstances.   We cannot assume that the Commission would act in case of an appeal under Section 73, except upon sufficient grounds.

It is readily conceivable that conditions from time to time might arise, even in the case of "fair view crossings,"—by reason of

increase in traffic and the location of obstructions just beyond the "fair view" limit fixed by the statute, the angle at which the highway and the railroad intersect, the grade of the approaches to the crossing, or other unusual conditions, where as in the case at bar, the Public Utilities Commission, after hearing all parties interested, and perhaps viewing the locus, might properly find that the public safety required additional safeguards over that afforded by a "fair view" or even by automatic signals.

We, therefore, see no impropriety or inconsistency with the purpose and terms of the Acts of 1917 in leaving with the local authorities in whom it has been vested for more than sixty years, the power of initiating proceedings for better protection at all grade crossings within their respective towns.

> *The exceptions are overruled.*
> *The Clerk of this Court will so*
> *certify to the Clerk of the*
> *Public Utilities Commission.*